United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. This is Judge Wilson in Tampa. Judge Luck is in Tallahassee and Judge Lagoa is in Miami. Miss Tisa is our courtroom deputy and we're here for oral arguments in Jerry Scott Heidler v. the Georgia Department of Corrections Warden. Corey Isaacson is here for Appellate Heidler. Sabrina Graham is here for the Warden and Mr. Miss Isaacson, are you ready to proceed? I am, Your Honor. May it please the court, Corey Isaacson on behalf of Mr. Jerry Scott Heidler. It's undisputed that Mr. Heidler is seriously mentally ill and was long before this crime and long after, but counsel didn't give the jury an accurate picture of Mr. Heidler's illness or of his background despite having records flagging both his florid psychosis and major depression and also records flagging his severe abuse and neglect as a child. The jury never heard, for instance, that from the time of the crime until the time of the trial, Mr. Heidler attempted suicide numerous times, was hearing voices and seeing visions, and was diagnosed with a psychotic disorder by the jail psychiatrist. The jury also never heard that Mr. Heidler first began hallucinating at age 11 or that that psychosis continued throughout adolescence and beyond or that he'd been given a series of depressive disorder diagnoses throughout his life. And the jury never heard that he was terrified of his stepfather who beat him with his fists, belt buckles, and the metal end of garden hoses, and one time held him down, took a car cigarette lighter, and burned his back over and over again. Ms. Isaacson, who would have testified to that if his lawyers had presented that testimony at his trial and his sentencing hearing? Specifically to the beating, Your Honor, or to all of the above? Well, to all of them. Great question. So to the beating, because that's the last thing that I talked about, the cigarette lighter incident in particular would have been Joan Pickering, who was a teacher who worked at a school that Mr. Heidler went to for years, and she was noted by trial counsel actually several times in their notes. She also tried to contact trial counsel. She had gone to visit Mr. Heidler while he was in the jail and she never received a call back from trial counsel. But had they reached out to her, she would have told them that one time when they were at school, she touched Mr. Heidler's back and he jumped, and that's what she found covering his back where the cigarette lighter burns. She would have also said that when she went to Mr. Heidler's house to confront his mother about it, she blamed Mr. Heidler. She said, well, if he wouldn't get on my husband's nerves and if he would stay away till after dark like I tell him to, then this wouldn't have happened. His sister, Lisa, also would have testified to the severe abuse that Mr. Heidler suffered at the hands of his stepfather. She also would have testified to the violence in the home between the parents. Lisa did testify though, didn't she, counsel? Your honor, she did, yes. And as I and provides an affidavit that's far different and more detailed than the testimony they gave. And what we've said is those affidavits, and I'm paraphrasing here, aren't worth all that much. And the reason is because there's a lot of incentive on family members to come many years later and to give contrary testimony. Specifically, Lisa testified at the sentencing portion, at the penalty portion, as I understand, and please correct me if I'm wrong, that when specifically asked whether there was abuse, that there was not any abuse. And then later on, she came and affide something contrary to that. Why is our case law discussing this very issue? Not quite relevant here. And that was in fact cited as I understand it by the state habeas court. Well, your honor, I wouldn't say that your case law isn't relevant here. I would say that the case law talking about family affidavits and particularly family members who testify differently at state habeas than they testify at trial are dependent on the circumstances. And here you have a case where Lisa, the sister, testified in her affidavit, not just differently than she did at trial, but also she testified that trial counsel hadn't really talked to her about mitigation and that she actually was prepared for her testimony the morning of her trial, the morning of her testimony, excuse me. And that if she had been spoken to previously, and if she had been prepared, she would have been able to detail these very sensitive... Isn't that itself contradicted by Ms. Palmer's testimony at the state habeas hearing? She indicated that she reached out numerous times to family, including to the sister that she had to prod the sister. In fact, she said she had to take extraordinary efforts to even convince her to come testify because so many family members really had washed their hands of all of this, at least at the time. And that ultimately did convince the sister to come. But even crediting all of that testimony over the sisters, we still have the problem of the sister is directly asked, this isn't a preparation issue. She's directly asked, was there abuse? And she said, it's really not a preparation issue. That's a testimony issue of whether it's true or not true, right? I disagree, Your Honor, because what Lisa was being asked to testify to was something very sensitive and very traumatic. And her affidavit said she was asked a lot of these questions for the first time on the stand. So I disagree that it's not a preparation issue because I think these type of sensitive, very critical, but very sensitive details really require working with the witness to let them know what you're going to ask and to let them know what they're going to be expected to tell the public while they're sitting there in the witness stand in front of the judge and in front of people they know and people they don't know. Your Honor, did you have another question? No. And the difference between what the jury heard... My question would be, I'm sure the state's going to say that this evidence that was not presented to the jury is cumulative of what was presented to the jury. There was considerable testimony about his upbringing and his mental illness, his bizarre behavior, his troubled childhood of neglect and abuse. What would be your response to the claim by the state that there was other evidence that could have been presented in support of his defense, but it would be cumulative of what was presented because there was a substantial amount of testimony that was presented to support his defense? Well, Your Honor, let's start with the abuse evidence because that's the last thing we were talking about. In terms of what was presented on abuse at trial, the only things that were presented, the only testimony that was presented was that the abuse never happened, which trial testified, they knew the mom was going to say that. I mean, they expected the mom to not be helpful at all. They called her a raving lunatic and they put her on anyways, even though they knew she was going to deny the abuse and she did. And Lisa, who was unprepared, denied the abuse. So the only testimony that came in regarding abuse was that it never happened. I'm sorry to jump in, but is that true? Let me point you to two things on the record. First, there is the, as you point out, the 1,100 pages of record from, I'm going to use DCF because that's the name of it in our state. I know it's called something different in Georgia and I apologize, but the equivalent of DCF for Georgia, all of those records were in and they detailed all of the allegations of abuse that were before the jury. And then even before that, the jury had already heard, as I understand, again, please correct me if I'm wrong, if I have the record wrong in any way, but the jury had already heard from Dr. Della Alessandro that there was significant abuse, use the term physical abuse, during the formative years that Mr. Heidler was growing up. That was echoed by some of the other doctors during the guilt phase of the trial. So the jury had in fact heard that there was physical abuse and had all of the records of the allegations of physical abuse before that. Am I wrong about anything that I just said? Let me start with a second point, your honor. I think that is incorrect in terms of what the doctors had testified to regarding physical abuse. Dr. Della Alessandro may have said, to the best of my memory, that there were indications or reports of physical abuse, but then in the penalty phase, the DFAX workers said they could never substantiate that abuse. Lisa and the mom said it never happened. Dr. Ifill was another one of the doctors who mentioned that there was either violence or threats of violence was the term he used in the home, but that doesn't at all compare to what actually happened. When it comes to the records, your honor, yes, there were 1100 pages. I actually think the exact number is 1018 pages of DFAX records, which is what we call them in Georgia. And they did have a lot of indications of abuse and neglect. They didn't detail the level of abuse or neglect, but there were many, many indications flagging it. But that's not a reasonable strategy for trial counsel to try to impart. But those are two separate questions. So the answer to my question is yes, the jury did have that information. There's a separate issue that you've raised of whether that presentation is an effective presentation, right? That's a separate issue from whether the jury had information about abuse. It did, right? Well, your honor, it had, like I said, indications. It had flags of abuse. It had reports that people were claiming abuse against Mr. Heiler and other kids in the family, but they didn't at all have the details of the type of abuse that happened that came out in state habeas. And I think it's a little more than a presentation issue because whether that information technically was in front of them, hidden in the stack of the more than 1,000 pages, is very different from whether or not it actually was in front of them in any meaningful way. And also- How is an introduction of an exhibit, which we assume that is in evidence and that juries consider, not the presentation of evidence to a jury for it to consider? Well, your honor, there has to be some kind of limit because if, for instance, that exhibit was a million pages, we wouldn't say that that information was really before the jury, or to put it in your language, at least it was not presented in any meaningful way to the jury. And we have case law saying that. I mean, there's a Sixth Circuit case that's with the Sixth Circuit case. So in that case, there were 2,500 records that were dumped in in front of the jury. But the court there specifically said that even though those records have been subpoenaed by trial attorneys, trial attorneys never sought consultation from a doctor or any mental health professional about those records. That's exactly the opposite of the record we have here. Here, every indication, and there's a finding by the state habeas court, that all of those records were turned over to the doctors here and the doctor's opinions were, in fact, informed by those very records, including Dr. Mase at the penalty phase and the three doctors at the state phase. So the Sixth Circuit case, even if that were our law, that doesn't seem to be directly on point. Do I have that case incorrect? I think you have that case correct. But I would say that it's not distinct in any meaningful way. And there's a couple of I don't think there's a meaningful difference between 2,500 pages. And it was 10 to 1,018 pages of defects records, and then another 100 and something pages of Georgia regional records. And one point I want to say, Your Honor, is the experts couldn't have had all of those defects records because they actually didn't get that stack of defects records until the middle of trial. Some of them they had in there, a large amount they had in their trial counsel files. Is there not a finding? Is there not a finding by the state habeas court that all of the records were turned over to each of the three positions and the Dr. Mase? There may be, but that would be incorrect as it applies to those defects records. How could it be incorrect? So under the standard of review, as I understand it, both Mr. Garrett and Ms. Palmer both testified independently that they turned over all of the records in their file to the state doctors and Dr. Mase, who then formulated their opinions based on that information. That finding is then adopted or that testimony is then adopted as a finding by the state habeas court. How can we find that to be an unreasonable determination or contrary to the clear and convincing evidence to the contrary? Yeah. Well, Your Honor, that's unreasonable just by looking at the face of the trial transcript. So the person who introduced those defects records was a defects worker named Kathy McMichael, and she testified on the first day of penalty of the penalty phase, and she brought those records for the first time with her and they were admitted through her. So it was actually after all of the state experts had testified. It was the night before Dr. Mase had testified. So I guess it is conceivably counsel. That's the introduction of the records that separate apart from whether they had them in preparation of their testimony. As I understand it, there were. So as the record, as I understand it, Mr. Garrett's record showed that he met a dozen times with Dr. Mase in advance of Dr. Mase testifying and testified that in advance Dr. Mase had all of the evidence. There's also testimony that they met a full day with Dr. Kugler to go over all of the information that was given over to Dr. Kugler. And that same information they test, both lawyers testified, was given over to the other two state doctors. So I'm not talking about the introduction. I'm talking about they had all of these records in advance of their giving their opinions well before the trial even started. Right. Well, I agree with everything you said, your honor, until that last statement. And I don't mean to quibble and say that they didn't have those records. No, you're here to disagree with me. It's OK. I promise. Thank you. They had the records that trial counsel had. At least there's testimony that that they did. But what I mean is just that one stack of defects records, a very large stack, there was a motion to quash in the middle of trial and those actually were not introduced and not given to trial counsel until the middle of trial. A lot of those records they did have, but they did not have all of those records previously. So that's all I mean to say. And I want to you know, we've covered a lot about abuse, not so much neglect yet. There was a lot of evidence of neglect that came in and state habeas that was not at all present during trial. But I also want to make sure that we cover mental illness because there was a lot of testimony that came in at trial related to Mr. Hyler's mental health. But the difference between what the reality of his illness was and what was presented at trial is worlds apart. So there were four experts, three on behalf of the court who are state doctors who testified to Mr. Hyler having borderline personality disorder, which is what the defense expert doctor may testify to as well. They all testified that he did not have psychosis. And they all testified that they said nothing about the major depression and depressive disorder diagnosis that he had received. Counsel, is that true? So as to both of those things, so as I understand the testimony of the three doctors at the at the guilt phase, each one said that there was or could have been episodes of psychosis and that that's consistent with what he actually had or what they diagnosed him with. In other words, a symptom is psychotic episodes. And each at least one, if not all of them, discussed how there had been at least evidence of depression or depression in his youth leading up to what they again found to be the new doctors and the old doctors. But it seems to me wrong to say that none of that came up at all, that it was that the record is devoid of that. I mean, I can point you to parts in the record where they specifically referenced depression, and I can point you to the record specifically where they referenced psychotic episodes. So I'm having trouble understanding how the record is completely devoid, even if it's not developed to the extent that you think it should. Well, your honor, let me address both of those categories, psychosis and depression. So when it comes to psychosis, what was said was that a component of borderline personality disorder sometimes can be transient psychotic episodes. But Dr. D'Alessandro said the only one episode of psychosis that he saw in Mr. Heidler's history was drug-induced. Dr. Mache, the defense expert, Judge Wilson, were you going to ask a question? Go ahead. I want you to address the second issue before you finish. Go ahead. Dr. Mache, the defense expert, said that he wasn't psychotic when he saw him. There were suggestions of psychotic episodes in his history, but I can't really say. I don't know. Whatever happened besides when I saw him, I can't say. And that's all that was said about psychosis, that it sometimes can be a feature of borderline personality disorder, but they didn't see it here. And when it comes to depression, the same. There was said that dysphoria, which is similar to depression, can sometimes be a component of borderline personality disorder. There was talk about his suicide attempts as a child, but they were described as symptoms of his impulsivity, not severe depression. And then his mother in the penalty phase described them as just attention-seeking behaviors. But when you look at those hospital records, which, by the way, when they were shown to Dr. Mache, he didn't recognize them, the defense expert. When you look at those hospital records, he was diagnosed with a depressive disorder during the hospitalization after those suicide attempts at age 11. He was there for more than six weeks before his mother took him away against medical advice. He was given an antidepressant medication that his mother never filled. Those hospital records note auditory and visual hallucinations throughout the hospitalization and note that his suicide attempts were the response to command hallucinations, telling him to hurt himself. So there was really no evidence of psychosis or depression that came out at trial, even though trial counsel had records documenting symptoms of psychosis and depression and mood disorder diagnoses throughout his childhood and adolescence, and that never came in. Judge Wilson, I heard that you'd like to- Well, I guess with regard to the ineffective assistance of counsel playing based on the period of foul emotion to suppress the confession, I guess my question is how do you get around that Georgia Supreme Court rule, I think it's 22, that requires that the claims have to be adequately supported and briefed in order to be exhausted in Georgia. Well, Your Honor, as we read it, and the state hasn't been able to point to anything to the contrary, Rule 22 applies to briefing only and doesn't apply to CPC applications. And the state has not been able to point to one case in which the Georgia Supreme Court is applying Rule 22 to CPC applications. Didn't it apply in the Whatley case, footnote 42, Rule 22, to the CPC? I'm not familiar with the Whatley footnote, but we cited the Whatley case. I know, that's why I'm pointing to it. That's how I read it. I'm not familiar with what footnote you're referring to, Judge Luck, but I'd be happy to submit supplemental briefing. But I'll tell you what, take a look at it. And I'll give you the exact footnote. And go ahead. I don't want to mess up the rest of your argument. But take a look at it. And then on rebuttal, we can talk about it. Okay. Great. Okay. I appreciate you flagging that. So there's been nothing that the state has been able to point to that shows that Rule 22 applies to briefing and we haven't been able to identify a case either that requires briefing. And in this case, it was at that time a 30-page limit for CPC applications in death penalty cases. And in Mr. Heidler's case, it was extended to 40 pages. And there's just no way that in a capital habeas case, all claims can be briefed in 40 pages, which is why it was the pattern in practice for many years to include this all claims that were pled below. And that's just the reality of the page limits in Georgia. And the Supreme Court of Georgia has never said otherwise. So as we read Rule 22, and as we've seen it applied in practice, we see no indication from the Georgia Supreme Court at all that they have. Counsel, in rebuttal, I would like to hear, I would like you to read the footnote in Watley. Okay. Because I think that that argument is not necessarily persuasive. Thank you. It's a page 664 and footnote 42. Of the CPC application? Of the no, of the of the Georgia Supreme Court opinion in that case, the one that you cite in your brief. Okay, I just wanted to make sure I have that clear. Okay, I will do my best to look at that. Apologies to Miss Graham for being a little distracted during your argument. And so as it relates to exhaustion, also, while we're on the topic, I mean, the state over and over again waived exhaustion as it relates to this claim and to many other claims. There was separate procedural default and exhaustion briefing in this case. And even not only in their answers, if I can just finish this sentence, Your Honors, not only in their their answers to Mr. Heidler's petition, did they say that this claim was adjudicated on the merits and was properly before the habeas court in procedural default and exhaustion briefing, they said the same. They said this claim has been adjudicated on the merits. There's no exhaustion problem here. And that under your case law is very clear, clearly an express waiver of exhaustion. So we believe that claim was exhausted and the other claims that that the the state repeatedly waived exhaustion in this case. And I'll turn it over to Miss Graham, because I know I'm out of time unless your honors have any other questions for me. All right. Thank you, Miss Isakson. We'll hear from Miss Graham on behalf of the warden. Thank you, Your Honor. My name is Sabrina Graham. I'm here on behalf of the warden asking that this court affirmed the denial of relief of the district court. I'll start off with the second claim since that's what we were talking about there. I think in order to understand what the state has argued in this case, you have to look at everything that has happened from state habeas on regarding this claim. For 18 years, this claim was never briefed in the sense that there were no facts, legal facts, no legal arguments, nothing presented to either state for either the state habeas court or the Georgia Supreme Court, regardless of whatever rule 22 states and it applies to CPC applications or briefs or whatever. Baldwin versus Reese says that you have to present your arguments to through one round of your appellate procedure, even if it's discretionary as our CPC application, except that except that. You would agree that, though, if the state court is able to fairly understand what that is and rule on it, then that's something that is preserved for later on, correct? Correct. So so let's go to what the state court did here, the state habeas court. So the state habeas court has two interesting parts to it. In one part, it sort of has this generic, anything I don't bring up is going to be deemed abandoned. But then it has something specific for the ineffective assistance portion. And for ineffective assistance, it says for anything that I don't specifically mention, the state I'm sorry, the petitioner is not met his burden on either deficiency or prejudice. And I make my ruling on that. That seems to be a merits determination, at least as to the claims that weren't briefed in either the post trial brief, or that were part of the evidentiary record at the hearing for those subsets that were ineffective assistance like these were. Why is that a determination on the merits? I think you do have two different findings there in the state habeas court. But however, when you get to that second finding, when it's talking about the ineffective assistance of claims, it says at the beginning of that sentence, I do believe unless otherwise specified. So the state had interpreted that as because it had already stated that anything that wasn't briefed is is abandoned, then it was abandoned. If you know, that's, that's how we read it. But if we're wrong, we're wrong. But regardless, when you go up to the Georgia Supreme Court, as you've stated, they did not brief that. Well, here's the issue. So I'm convinced I'm right on my reading of footnote 42. And in in Watley, but I think Miss Isaacson's right that no other case from Georgia that I could tell, has ever applied rule 22. In in the CPC context, and where that's the case, can we can we really say that it's a, an independently adequate state rule, a state procedural rule that we've been enforced, where those that have been enforced in the past are those that where there's dozens or even hundreds of cases doing so? I don't, I don't think you can say that it's not adequate and independent in this particular case, because typically CPC denials are summary denial. So they're not going to explain that they're not going to put in there. Hey, you didn't brief this. So we're finding it abandoned. I mean, the only time that that's really ever going to come up would be after they granted the CPC application. There's no evidence showing that they don't apply this to CPC. And there's evidence showing it does. And or Johnson versus Lee, simply because we don't have the court saying every time they use this particular rule, that it's not adequate and independent. So I would still say is adequate and independent. Let me ask you this is the easiest way for us to handle this, to simply assume away the procedural default and any of the the rules and to get to the underlying merits and review it de novo, because it seems to me that at least if we do look at Strickland on the prejudice side, it's really hard to say that that any one piece of evidence here is prejudicial, given the overwhelming amount of evidence of guilt here. I mean, nobody disputes guilt. So it's odd to be talking about a guilt phase issue. When when nobody disputes guilt here, the only thing that was going to save Mr. Heidler's life, as everyone seems to agree, is a fulsome presentation of mental illness and mitigation at the throughout the guilt stage to penalty stage. So given the DNA evidence found on the cigarette, given the fingerprint found on the window, given the the the identification by three people who knew him, that they were kidnapped from the house and taken, you know, given his confessions independent of this to both the doctors and to, as I can tell prison officials, how can we say that this is prejudicial in any way, even if we get past and sweep past all of the the procedural default issues? Well, Judge Luck, you stole my argument, because that was my next argument. Yes, absolutely. We didn't brief on the actual merits of this, but I don't think there's any way you could ever show prejudice regarding the guilt phase of trial, because you do have him specifically confessing in addition to all of the other information that he committed these crimes. So even if that particular confession was suppressed, you would still have overwhelming evidence of his guilt. Is there anything in the record? Is there anything in the record that would indicate why his counsel never filed a motion to suppress his confession? There is nothing in the record, Judge Wilson, because the trial counsel was never questioned about this particular issue in state habeas. In state habeas, the amended petition, you know, had this as a laundry list, one of the things in the laundry list of ineffective assistance of counsel claims. The counsel was never questioned about this. There is no evidence from state habeas regarding why or why they did not challenge the confession. So I would just be speculating there. And as I said, this claim was never briefed for 18 years. It was never briefed until we got to our final merits brief. And when they finally did brief the claim, the state asserted that it was unexhausted because it had never been presented to the state courts. So if we can turn to the first two issues in the COA, and I think your opposing counsel has probably rightfully lumped them together. We haven't really separated them out. And I think that's probably the best way to look at them. But I can tell you that there's at least two issues that I like for you to address from my perspective, and I'm only speaking for myself. The first is that it seems to me that at least that what counsel thought the doctors would testify to going into the hearing, going into the guilt phase, was not necessarily what came out at the guilt phase. I think your opposing counsel fairly characterizes at least some of the doctor's testimony as not quite directly helpful to the defendant here. Although the report stated one thing, and in preliminary hearings, they stated one thing. When it got to the trial, especially Dr. Eiffel was less than unequivocal about whether the guilty by reason of mental illness was supported by the evidence here. So that's number one. And why, given that state, you don't call Dr. Maescher or do some more or put some more evidence on. And the second is this issue of, I'll call it the dump, for lack of a better word, but the dump of evidence at the end, the 1,100 records, of whether, even though that may show a complete investigation, even though that may show not ineffectiveness in and of itself in its presentation to the jury about the critical parts of that evidence. So those are the two things that I'd like for you to address. Okay. Starting off with the first one. Regarding the trial expert, well, the trial court's expert and the state's expert, Eiffel, D'Alessandro, and Kugler, I think that the record shows that I don't think that their testimony was necessarily that much different than their reports or what trial counsel said. I think there was two particular instances, one from D'Alessandro and one from Eiffel, that bothered trial counsel after the fact. But I don't think overall that their testimony was different than what trial counsel thought it was going to be. And to go back to this, we're talking about guilty but mentally ill. That's what the doctors were called for. So Dr. D'Alessandro said on several occasions, he has the criteria, the mental health criteria, to meet guilty but mentally ill. Dr. Kugler specifically says he meets the standard of guilty. I think it's Dr. Eiffel that's probably the biggest issue. Yes. And he said, you know, he essentially has to be impeached with his report, doesn't he? Correct. And Mr. Garrett put the report in front of me and said, you said you you agree that he met the criteria here for guilty but mentally ill. And I agree. I think Dr. Eiffel, he didn't, he couched in terms that he did not want to invade the province of the jury by saying he is guilty but mentally ill. He said, you know, yes, he has the symptoms, but you can't do that. But I think this all goes back to when you're looking at what trial counsel did with the mental health experts and with their record. Right now, what Heidler is doing is doing a hindsight analysis, and he's focusing on his psychosis, on his reports of audiovisual hallucinations. But when you look at these records, when you look at all of these I don't know that that's completely fair. That may be some of what what what counsel is doing. But that's not all of what they're doing. What they're what part of what they're doing is saying the strategy here was to argumental illness. And there was a lot of information that counsel had that trial counsel had here that they kept their powder dry on at the guilt phase. And why do that when at least one of the doctors isn't exactly on board with what you think that testimony is going to be or going to come out as? I don't agree with that. I think they have gone back and cherry picked particular things in his past in his in his background and in his mental health history to say that the mental health experts and the trial counsel should have focused on those in order to get a specific diagnosis. Whereas that's I mean, that is pure hindsight analysis. Counsel, let me put it this way. That may be part of their claim. But I think their claim is also as I read it, and this is why I want you to respond to it, that counsel didn't do a good job, even on its own of presenting what they thought they had. And that would have that would have required them to put on their own physician, which they chose not to do that would require them to on miss miss pick your and I apologize if I'm pronouncing any names wrong, Miss Davis, Ruthann Davis, to put on, I think it was Dr. Butler. Those are the people they go through where they said that this the council had information about these folks, and that they should have put this on at the guilt phase to put on a fulsome guilt, guilty but mentally ill defense. Well, then I think, I mean, again, I had to get back to what the state habeas court said and whether or not that was reasonable. You're looking at here, did they put on everything that they could have possibly put on? No, but strictly doesn't require them to put up every single witness. And the people that they're saying that they didn't talk to, like Miss Pickering, or Dr. Butler, Dr. Butler, who was a pediatrician who only saw him for 30 minutes when he was 12 years old, Miss Pickering, who is a teacher, whereas trial counsel testified, they talked to many of his teachers and his defects workers. So and then you also have the defects records that trial counsel did a timeline on that doesn't show at any time that he was actually physically abused, they could never substantiate that. I'm not saying that did not happen. I'm just saying that it's not in the records there before them. And so what you're asking trial counsel to do is is to create something that I mean, they investigated the best they could. And they talked to everybody in the community, not everybody. So this claim doesn't really isn't an investigation claim. I tend to agree with you on that. This is more of a presentation claim, which is, and that's why we expanded the COA to say not just that you investigated this information, but that you presented this information to the jury to support the very theory that you were going under in this case, guilty, but mentally ill. And they did absolutely do that. Again, I do have to go back to what they had, what they had were the defects records and the mental health records and those types of things. In those mental health records, in the defects records, you have an individual, Mr. Heidler, who was diagnosed with all different kinds of disorders, but largely conduct disorders. And the the emphasis was never on the audio visual hallucinations. And when we talk about the audio visual hallucinations, I think it's important to point out that these are self reports by throughout the years that each one of the mental health experts knew about. And they were asked about, but there was only one doctor who ever said she saw him have an actual hallucination. And that was Dr. Butler when he was 12. And that was again, she saw him for like 30 minutes. I don't know whether they talked to her or not. It doesn't seem from the record that they did, but regardless, they had all this information. They talked to all the doctors about it. And the doctor said, look, we think he has borderline personality disorder, which has psychotic features to it. So that would explain why he has heard voices here and that over the years, they just did not see it as a long standing, you know, where it was lasting longer than, you know, a day or something like that. They did not see that. They have records that he had attempted suicide. Correct. And that was testified to a trial. And that's part of the borderline personality disorder. The borderline personality disorder includes self mutilation, suicide attempts, and brief psychotic episodes, which all of the experts testified to. And they stated, you know, they had all of this information in there. And his mother did specifically testify also during the sentencing phase that he stood out in front of the log truck and tried to kill himself and he hung himself and he tried to kill himself. But each of the experts also said there were these suicide attempts over the years. So, again, I'm back to the way that I see what trial counsel had before the mental health experts, they gave them the record. The mental health experts came up with the diagnosis of borderline personality disorder. In addition, they stated that he had other mental health issues that qualified him for guilty but mentally ill. I mean, Dr. D'Alessandro specifically testified, hey, I'm not saying that this guilty but mentally ill is predicated on the personality disorder. I'm talking about his history where he has been severely mentally ill, you know, throughout his life. And I think where the disconnect may be coming in is that the mental health experts did not give him a specific diagnosis for those other problems because it was a cluster of problems. And now you have new mental health experts saying that he's got schizoaffective disorder, but this is after the fact. Let me ask you this. Again, part of the claim is, it seems to me is, and I agree with you that part of it has to do with sort of looking back to be the diagnosis really is this as opposed to what the doctor said. But part of it seems to be a presentation claim, as I mentioned. Does that matter in a system like Georgia's where even if you are guilty but mentally ill, you still have to go to a penalty phase and all of that information is then brought in and the jury then has to make a determination based on all that information. In other words, if part of the claim is they didn't bring in some of this other stuff, other this mitigation at the guilt phase and didn't bring in Dr. Meish, is the fact that they did bring all that stuff in or a good chunk of it in through either witnesses, documents, and Dr. Meish's testimony at the penalty phase means that any presentation errors at the guilt phase are either not prejudicial or not deficient? I think that's certainly, you know, debatable because you're talking about whether or not it would have created a reasonable probability of a favorable outcome in the guilt phase. And there's, I don't see really the daylight between guilty and guilty but mentally ill. So I would say yes, that there, you know, you do have the presentation would not matter. In other words, it would matter if under Georgia's scheme, if you were guilty but mentally ill, the sentence was life and no penalty phase happened. But as I understand under Georgia law, and again, correct me if I'm wrong, you still go to a penalty phase, the jury still has to make a determination of whether you qualify for an aggravator, whether the aggravators outweigh the mitigators, and make a determination ultimately on death. Is that right? That's correct. And in the Georgia Supreme Court, and I know this isn't clearly established federal law, they've looked at cases where they have raised the issue that they didn't put up guilty but mentally ill in the guilt phase and a death penalty case. I think it was in Cook, which had been decided later on by this court. And they said, you know, because death is still on the table, we can't say that they were ineffective. You just had to look to see whether or not that information was mitigating, not whether or not you would have gotten a different verdict at the guilt phase of trial. Speaking to the guilt phase of trial, I think Judge Wilson is right on point there. This is all cumulative evidence. I mean, the jury, the jury knew that he was in defects, the jury knew that he went to foster care, the jury knew that he self mutilated, they knew that he had been suicidal, they knew that he had an imaginary friend called Bobo the mouse. Oh, I don't know if I know, they knew about the imaginary mouse. I don't know if they know about the name. They knew, I mean, the mental health experts testified that there were indications of physical abuse. And again, the defects records, they could never confirm whether or not there was physical abuse. And the defects worker testified during the sentencing phase, hey, we couldn't confirm it because the mother was constantly running from defects. And the kids were always coached as to what to tell us. So the jury heard all of that. The jury heard from his mother about his suicidal attempts. And they heard from you know, his everyone that this was a terrible, terrible childhood. And in fact, that's exactly what the district attorney said. During his closing argument, he said, Mr. Heidler has had a terrible childhood. This wasn't in dispute. Everyone knew that he had a terrible childhood. They knew he suffered from mental illness. They knew he'd been in Georgia Regional Hospital and committed. And he was in special schools, they knew all of this for the state habeas court to say more of this information, even more detail of this information isn't going to create a reasonable probability in this particular case. So counsel, I asked you to focus on and this stuff and this part and your opposing counsel discussed it during her argument about the method of presenting a lot of the information that you're talking about now. As just sort of, again, I'll call it a dump. I'm sure that's not the right word for it. But that's what I'll call it at the end of trial. So how is that an effective way to present the good nuggets for Mr. Heidler as doing that to the jury, as presenting that to the jury? Well, none of the information that I mentioned was part of putting in as a dump in the defects records that all of that information came out through witnesses, not through I mean, I'm not saying that it wasn't there also in the defects record, a duplicate of what the people had testified to. But they heard that information live from the witnesses. So that's not that wasn't. I don't think they dump that information into the to the jury through just the defects records. So that's that. Is that what you were asking? I'm sorry. Did I understand? Let me put it this way, counsel. There is a lot of information that's in those records that did not necessarily come out in witness testimony, at least in detail form. And you don't need to take my word for it. All you need to do is take Miss Palmer's word for it, because that's what she said she did as part of her strategy. And what I'm asking you about is whether that is addressed. Your opposing counsel has stated both in brief and an argument that that is an ineffective way to present this sort of evidence to the jury that the jury can reasonably be expected to look at 1100 pages of child services records, some of which is in handwriting and some of which I'll concede having looked through it all myself is hard is hardly legible or is not legible. That that's not an effective way to present evidence. So if you would address that point, please. Sure. Yes. I do not think that trial counsel put those defects records in and that in the sentencing phase, thinking that the jury was necessarily going to read through every page. I think you have to look at both phases of trial to understand the strategic decision there behind trial counsel's decision in the guilt innocence phase. Trial counsel put up the well, trial counsel didn't. The mental health experts were testified and they chose not to put in the records. And at the end of it, the district attorney argued in closing argument. He said, oh, well, they didn't put in any of his mental health or medical records or anything here to prove what these doctors were saying was true. And Mr. Garrett said, you know, in response to that, I don't have to put these records in. We have the experts here testifying to this. So when they got to the sentencing phase, they put up their witnesses, they put up their mental health expert. In addition, they also put in the records sort of. I don't know if it was had argued, but it certainly was briefed to what he'd argued before in the guilt phase. And so to me, that makes it a strategic decision on how they chose to put it in, whether or not that's how most attorneys would want to put in those particular information. You know, maybe, maybe not, but I don't think it's completely unreasonable for counsel to put it in under that situation. And those facts, given the fact they had put up all the other witnesses to talk about the information that was in the defects records. And I'd like to clarify the defects records. Trial counsel had the majority of the defects records prior to trial from three of the counties, Appling, Bacon, and maybe Tattnall, I can't remember. But they didn't have the, I guess when it came time for trial, they didn't have the Tombs County defects records because they're all split up. You know, our defects is done by county. So they apparently didn't have those, but they had all of that information because when you look through trial counsel's files, you see, they did it tight. I mean, they have a handwritten in a tight timeline of everything that was in the defects records. And Judge, Ms. Palmer testified that she actually went over all of the defects records with Sherry McDonald, who was the defects attorney at that time. So to go back to, at the end of it, is it cumulative or not? Was it unreasonable for the state habeas court to find that the new evidence that petitioner said should have been presented or should have been presented in a different way was not cumulative. And I think here you can say that it's completely unreasonable for the court to have found that to be largely cumulative of this information. And again, especially given the heinous nature of the crime, you had a jury who saw a video of the crime scene and they saw a little boy's head who was blown in two. They had, you know, video of Amber Daniels talking about what Heidler did to her, reaching across to the, you know, the caseworker and saying, Oh God, I mean, this was all fresh in their memory. And there is still nothing in this record showing that Heidler was in any type of psychotic episode at the time of the crime. He didn't have an auditory hallucination. He didn't have a command hallucination or delusional compulsion. And, you know, when you're a jury and you're sitting here and you're looking at this crime, you know, he's mentally ill, you know that he's had a terrible childhood, but you still want something to show that he didn't know what he was doing that, you know, that affects his culpability. But none of these experts are still saying, I can't, none of them could say he was in the middle of a psychotic episode. They may say maybe he was, but they can't say that he was because he confessed to so many different and said, you know, to so many different experts. So I think without that piece of information before the jury, I don't think that it was unreasonable for the court, the state habeas court to say no reasonable probability of a different outcome in the sentencing phase of trial. Did I answer that question? I don't have any other questions. There were a couple of issues I wanted to address that were brought up during Ms. Isaacson's argument regarding Lisa, his sister. There are notes in the file from trial counsel where they questioned Lisa about Lawton Mosley, the stepfather. And she said in those notes that he hit her one time and that was it. And so she gave no further information that there was physical abuse by Lawton Mosley to trial counsel. I can't tell you who was present during that. All I can say is that Judge Palmer testified that she interviewed her and this is in those notes, that particular information is there. Regarding the abuse that has been spoken of again, that is alluded to in the DFACS records, that is alluded to in his history, but it was never proven by any state agency that he was physically abused. Now he certainly, his mother was certainly found that she deprived him and custody was taken and the jury knew that. Unless the court has any other questions, I would just ask that the court affirm the denial of relief by the district court. Thank you, Ms. Graham. We have your argument. Thank you. And Ms. Isaacson, you have reserved some time for rebuttal. Thank you, Your Honor. Okay, there are several issues that I want to make sure that I address, but I can start with the Whatley footnote. I want to make sure I don't forget about that. So the Whatley footnote, and I'm just looking off screen to make sure that I'm looking at the right footnote. The Whatley footnote is from the Georgia Supreme Court opinion on the appeal. And what happened in Mr. Whatley's case is they used a similar footnote in appellate briefing, saying we're incorporating by reference all earlier claims. And we completely agree, Rule 22 applies to appellate briefing. Rule 22 requires the briefing of all claims when it comes to appellate briefing. What we're saying is there's no indication at all that that same rule applies to the CPC application. And again, the state hasn't been able to point to any case that says differently. So I hope that clarifies things for Whatley. Let me ask you this, Ms. Isaacson. Let's just assume for argumentative purposes that we were to decide that the ineffective assistance of counsel claims with regard to the failure to file a motion to suppress was exhausted in state court. I mean, based on the record that we have, why can't we decide that claim on its merits? Well, Your Honor, I want to say two things. First, I believe trial counsel in this case did file a motion to suppress so they did want to suppress a statement. They just presented no evidence in support of it, and specifically no evidence of that their client was severely mentally ill. And in terms of the question about why wouldn't you all just decided on the merits? I think there's two answers to that, at least two that I can think of right now. Number one, I think Clisby is a case that is a parallel here, which says, which this court has said, when there's a case when there's a claim that hasn't been adjudicated by the district court, we send it back for adjudication and we don't consider the merits. Yeah, but that's where it's completely ignored counsel, not where the court makes a decision on the wrong basis. You're correct, Your Honor, that is a distinction. But this is a very significant procedural ruling that not only has implications for this case, and not only has implications beyond this claim. I mean, it's important to remember that the district court the vast majority of Mr. Heidler's claims as unexhausted or insufficiently pled or both under the same reasoning that the district court throughout this suppression claim. And so it's important to actually rule on the procedural ruling, not only because it impacts other claims in Mr. Heidler's case, but because this is a really critical issue for all capital habeas cases. And it's a procedural issue that needs to be resolved, regardless of whether the court believes the underlying merits are significant or not. And so, you know, we believe that this is something that really needs to be to be resolved. But if we were to reach the merits, and there are two prongs to Strickland, I mean, given the heinous and gruesome nature of the trial, we could resolve this case just based on the second prong of Strickland versus Washington, that it's clear that the result of the proceeding would not have been different if counsel filed a motion to suppress just given the gruesome nature of the case. Well, two things, Your Honor. One is, I think there is a unique weight that a confession holds. But two, and this relates to something I wanted to make sure to cover in rebuttal, which is counsel's intention at the guilt phase. Counsel's intention at the guilt phase was, as Judge Luck has pointed out, to obtain a guilty but mentally ill verdict. And that required three things. It required, one, showing that there was a disorder of mood or thought, something that there was ample indication of in the records, but that trial counsel did not investigate or present. It also required showing concurrent illness. So they needed to show that Mr. Heidler was mentally ill at the time of the crime. It also, the third prong was they needed to show that this wasn't illness marked only by antisocial conduct. But going to the first two prongs, needing to show disorder of mood or thought, and needing to show concurrent illness. One, to get to your question, Judge Wilson, the confession undermined their ability to show that Mr. Heidler was extremely mentally ill at the time of the crime. The confession undermined that. And it's important to remember that the confession was recorded. I think it was- How's that true when the entire context of the confession, at least this one, was that it was a dream and the police coaxed him into that dream or to discuss that dream. I'm not sure that you could say that it undermined any mental illness theory. The entire crime, including the fact that his son had died, which he also discussed in the confession and he had a funeral that day, all of that fed into the theory of mental illness, did it not? I think, Your Honor, that there were aspects of the confession that did support the theory of mental illness and other aspects that didn't. And it's important to remember that this confession was recorded after four hours of unrecorded interrogation, and we don't know what happened. We don't know what kind of preparation, we don't know what kind of pressure happened in those four hours. But I do know- We do. You just speculate that something else might have happened, but both the officers testified about what happened during those four hours, did they not? Both at the suppression hearing and at trial. I don't remember the extent of what they testified to, I don't remember that they testified exactly what happened during all four of those hours, but they may have. But in any event, there's nothing in this record that would indicate why counsel did not file a motion to suppress this confession. Did they ever say, were they ever asked that question? Well, Your Honor, again, my memory is that they did file a motion to suppress. They just didn't support the motion with any evidence of mental illness, even though that would have been the strongest. No, but Judge Wilson's point is, and it's a good question, because I have the same question. At the state habeas hearing, when you had counsel on the stand, did you ask them why they didn't file a suppression motion as to this basis? We understand they filed one as to a different basis. Were they asked, or was there any record in the state habeas record as to why they didn't do so as to this basis? No, to the best of my memory, they weren't asked about that. Isn't that part of the issue about being fairly presented here? Because as I understand it, when the opportunity to ask those questions was put to counsel, for whatever choice, and I get it, you had a million claims, that one wasn't pursued. And then when it came time for the trial brief afterwards, the claim wasn't pursued also. So how can we say that it's sort of preserved for us here right now? Well, Your Honor, I think you can say that because Mr. Heidler followed all of the rules that were relevant and required in state court. And so in Georgia, there's no briefing requirement in state habeas court. And there's also no briefing requirement for CPC applications. And that's how I think you can say that. Your Honor, can I ask for a minute to address some of the ineffective assistance of counsel? You can have a few more minutes. We'll give you three more minutes. Thanks so much, Judge Wilson. I appreciate it. So one thing I wanted to address is, Judge Luck, your question about whether this is just a presentation issue. And I agree with the but it's also an investigation issue. So the records were a starting point, they weren't an ending point. But counsel considered them in many ways to be the ending point, not just in the way that they dumped the records and expected the jury to somehow find these gems within the record. But also the fact that there were so many investigative leads, which counsel identified many of them, I mean, they created potential witness lists of people and contacted very few of them. But these were red flags that demanded more investigation and clearly established federal law says counsel can't do that. They can't have records full of red flags, indicating that more investigation needs to be done, and then just ignore them. But that's what counsel did here. I mean, counsel did a great job starting their investigation, they obtained extensive records, that was exactly what you should do in a capital habeas case. But then they largely dropped the ball after that. And if you look at their billing records, which, by the way, are not at all in contradiction to their testimony, when you look at their billing record, then they didn't they testify as to their billing records, that which happens a lot with a lot of lawyers, which is we put in a lot more time, and we don't necessarily input all the time that we put in. And they specifically testified that they actually underreported the amount of work that they put into the case. Is that not accurate? That's not the full extent. That is accurate, Judge Lagoa. Judge Palmer also testified, though, that she was very careful about documenting witness interviews, because she would forget them afterwards if she didn't document them. And we're looking not just at their billing records, but also with their notes. I understand, but there was also evidence in the record that there were a lot of individuals who did not want to cooperate and did not want to testify. So I'm not sure how you could bill, you know, trying to speak to, you know, Jane Doe, and she, you know, slammed the door in my face. You're right, Judge Lagoa, there was testimony to that. There was not testimony, though, about when that occurred. And if you look at their billing records, Judge Palmer, who was in charge of the mitigation investigation, even though she avoided death penalty training with the plague, her, she contacted Marilyn Dryden, who ended up testifying, had a 20-minute phone call with her, I believe on May 26 of 1998. So over a year before trial. She then does not bill for anything related to mitigation, non-expert mitigation investigation, until I believe it's August 17th, 1999. So the week before voir dire starts. And then in that week, in the week before voir dire and during trial, there are a lot of, of, of indications in her billing records that she tried to talk to people and did talk to people. But she went more than a year without doing any mitigation investigation. And the bulk of that mitigation investigation happened in that week prior to voir dire and during trial. And Your Honors, as you likely guessed, I could go on forever, but I'll respect the time unless you have other, other questions. Well, we have your argument, Ms. Isakson. And the case was well argued by both Ms. Graham and Ms. Isakson. And Ms. Isakson, I see that you were appointed by the court to represent Mr. Hagler on this appeal. And the court thanks you very much for your service. It's been my honor. Thank you so much. And so that completes our this morning and this court is adjourned. Good afternoon. Thank you all. Thank you.